# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON

Assigned on Briefs March 6, 2007

## STATE OF TENNESSEE v. WADIE MICHAEL HOLIFIELD

**Direct Appeal from the Circuit Court for Tipton County**
**No. 5125     Joseph H. Walker, III, Judge**

---

**No. W2006-01225-CCA-R3-CD - Filed April 5, 2007**

---

The defendant, Wadie Michael Holifield, was convicted of aggravated sexual battery, a Class B felony, and sentenced as a violent offender to serve eighteen years in the Department of Correction. He appeals two issues:  (1) the sufficiency of the evidence; and (2) whether the trial court erred by denying his motion for a new trial because the jury allegedly was tainted by overhearing courtroom conversations between the victim and her family.  Following our review, we affirm the judgment of the trial court but remand for entry of a corrected judgment to reflect the date of the offense as January 16, 2005, rather than February 4, 2005.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed and Remanded for Entry of Corrected Judgment**

ALAN E. GLENN, J., delivered the opinion of the court, in which DAVID G. HAYES and JERRY L. SMITH, JJ., joined.

Gary F. Antrican, District Public Defender; Periann Houghton, Assistant Public Defender (on appeal); Julie K. Pillow and Ray Glasgow, Assistant Public Defenders (at trial), for the appellant, Wadie Michael Holifield.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel E. Willis, Assistant Attorney General; D. Michael Dunavant, District Attorney General; and Colin A. Campbell, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTS

The twelve-year-old victim, J.H.,[1] is the defendant's stepdaughter.  Lisa Norman, the victim's mother, testified that on the day of the offense, January 16, 2005, she had been married to the

---

[1] This court's policy is to refer to minor victims of sexual abuse by their initials only.

defendant for approximately fifteen months. She acknowledged that she and the defendant had been having "difficulties" with credit cards and that they had fought that day after church. That night, J.H. was sleeping on a couch in the living room when the defendant asked Lisa[2] to "go take a bath so [they] could be intimate." Lisa then described observing the following events:

> I was in the tub, and [the defendant] had come back to the bathroom and looked in. I can't remember if he said something or just looked in and then walked back to the living room.

> Well, I sat there a minute, and then I got an uneasy feeling. I don't know why. And I eased up out of the tub and walked into the living room, where I found – where I found him with his pants down and my daughter's pants down, with his face near her buttocks, with his hand on his penis.

Lisa said that the lights in the living room were on and that there was nothing between her and the defendant to obstruct her view. She said that she "could actually see [J.H.'s] buttocks" and that the defendant's head was "very close" to her buttocks; he "was bent over all the way." When Lisa confronted the defendant, "he pulled [J.H.'s] pants up and his pants up" and told her, "All I was doing was kissing her butt." J.H. awakened when she heard "the confrontation," and Lisa took her to a neighbor's house and called her mother. Lisa's mother, Claire Norman; her brother, Jerry Keith Norman; and her older daughter and her boyfriend later arrived at her house. Before they arrived, the defendant "had gotten the muzzle loader" and "said he was going to shoot himself," but he did not. Lisa said that when her brother arrived, the defendant said, "I've messed up big" and "tried to have excuses for what had happened," saying that his and Lisa's "sexual relationship wasn't good lately, and that the kids walk around and what they walk around in, which is normally shorts and tank tops." The police subsequently arrived and took the defendant into custody. Lisa said that, eventually, she and the defendant divorced.

The victim, J.H., testified that she went to sleep that night on the couch wearing a "pair of pajama pants and a T-shirt" and that she was a "sound sleeper." She remembered being awakened when she heard her mother and the defendant arguing and said that her mother then took her to a neighbor's house. Asked if she had any recollection of the defendant touching her that night, she said, "No, sir."

Jerry Keith Norman testified that, on the night of the offense, he went to Lisa's house in response to a call from his mother. He knew what the problem was before he got there but asked, "What's going on?" when he arrived because he wanted "to see a response." The defendant said, "I really messed up this time." Keith said that when his mother arrived, she "hit [the defendant] three or four times," and "[h]e didn't say anything. He just took it."

---

[2]Many of the witnesses in this case share the surname Norman, therefore, for the sake of clarity, they will be referred to by their first names. We intend no disrespect and do so to avoid using the entire names of the witnesses in each reference.

Keith confirmed that the defendant offered excuses for what he had done, saying, "Your sister hasn't given me sex in over a month." Keith told the defendant, "I don't care if she hasn't given you sex in a year. You don't put your hands on children. You don't touch children," and the defendant responded, "Yes, sir, you're right." The defendant also told Keith, "Well, you ought to see the way those girls run around here half naked," and Keith replied, "I don't care if they run around here butt naked, you don't touch babies." Again, the defendant responded, "Yes, sir, you're right."

The victim's grandmother, Claire Norman, testified that prior to January 16, 2005, her relationship with the defendant was "good" and he was a "wonderful" son-in-law. She said when she got to Lisa's house that night:

> I went in very much out of control. I was screaming and hollering and slapping and slapping and slapping [the defendant].
>
> And he kept saying, "I didn't hurt her. I didn't hurt her.
>
> But I said, ". . ., you were kissing her butt and masturbating."
>
> And he said, "No, I wasn't. I couldn't get it up."

Claire also stated that it was "maybe an hour, hour and a half before [they] called" the police, and during that time the mood in the house "wasn't friendly. Lisa, of course, was very, very upset. I was very angry. [Keith] was very composed. [The defendant] was worried, and asked us not to call the police."

The defendant testified that on January 16, 2005, he and Lisa had argued on the way home from Claire's house about whether their credit cards were "out of hand." J.H., Lisa and he then watched a movie, and J.H. fell asleep. Lisa suggested that they have sex, but the defendant told her he was worried he was "impotent" because he was taking Lexapro, an antidepressant. Nonetheless, he asked her to take a bath because he "can't stand" body odors. He went into the bathroom once while Lisa was bathing and they talked about buying some boots. As Lisa was finishing her bath, the defendant told her, "Well, I'm going to go turn all the lights out and the TV, and I'll be right back." He then testified that the following happened:

> I went back over where [J.H.'s] feet were and [was] going to reach under there and see if I could find [the television remote control]. The crack in the cushion is usually where it ends up. I noticed [J.H.] had threw [sic] her covers off, and she just had her hand like – I don't whether she was scratching her butt or leg, but just had her hand sitting there, and she went back to sleep.
>
> Well, I had to move her foot to get the remote [controls] out. When I did, she drew her legs up like a little fetal position. I turned the cable box off, turned the TV

-3-

off, walked over and put the controls on the end table, picked up my cigarettes and lighter, slid them in my pocket. When I did, my pants started to fall down, so I grabbed my britches and pulled them up with one hand.

Lisa was coming out of the bathroom. She said, "What's taking you so long?"

I said, "I had to find the remotes and turn the TV off."

And she come [sic] walking to me. She said, "Why you [sic] holding your dick?"

I said, "I ain't holding my dick. I'm holding my britches up."

She said, "Oh. Why is [J.H.'s] pants down?"

And I looked over, and her pants were down about that far. But when she was in a fetal position, I guess at the angle she was coming like this and [J.H.] was laying [sic] here, it looked like it was further down. She walked over to [J.H.] and was covering her up and looked at me and said, "Why is your pants down in back?"

The defendant denied saying, "All I did was kiss her butt."

The defendant testified that he told Claire he did not touch the victim and that he and Lisa had a disagreement about their credit card bills. He said the comments he made to Keith regarding his sexual relationship with Lisa were made in the context of a discussion about their marital problems and disciplining the girls, not as excuses for molesting J.H.

The defendant was sentenced to eighteen years as a violent offender.

## ANALYSIS

### I. Sufficiency of the Evidence

On appeal, the defendant argues that the evidence presented at trial was not sufficient to support his conviction for aggravated sexual battery. In consideration of this issue, we apply the rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); see also Tenn. R. App. P. 13(e) (2006); State v. Evans, 838 S.W.2d 185, 190–92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). This rule applies when the determination of guilt is based upon direct evidence, circumstantial evidence, or a combination of both direct and

circumstantial evidence. State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing State v. Dykes, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 405 S.W.2d 768, 771 (Tenn. 1966) (citing Carroll v. State, 370 S.W.2d 523 (Tenn. 1963)). Additionally, a jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

To argue the insufficiency of the evidence in the present case, the defendant asserts that the State "did not prove that there was indeed contact made" with the victim, when the offense of aggravated sexual battery requires unlawful sexual contact. The defendant points out that Lisa "did not see any touching or contact between the [victim] and the defendant."

Aggravated sexual battery is defined as:

[U]nlawful *sexual contact* with a victim by the defendant . . . accompanied by any of the following circumstances:

> (1) Force or coercion is used to accomplish the act and the defendant is armed with a weapon or any article used or fashioned in a manner to lead the victim reasonably to believe it to be a weapon;

> (2) The defendant causes bodily injury to the victim;

> (3) The defendant is aided or abetted by one (1) or more other persons; and

>> (A) Force or coercion is used to accomplish the act; or

>> (B) The defendant knows or has reason to know that the victim is mentally defective, mentally incapacitated or physically helpless; or

-5-

(4) *The victim is less than thirteen (13) years of age.*

Tenn. Code Ann. § 39-13-504(a) (2003) (emphasis added). "'Sexual contact' includes the intentional touching of the victim's . . . *intimate parts*, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification." Tenn. Code Ann. § 39-13-501(6) (2003) (emphasis added). The "intimate parts" referred to by Tennessee Code Annotated section 39-13-501(6) include the buttocks. Tenn. Code Ann. § 39-13-501(2) (2003).

It is undisputed that the victim in this case was twelve years old at the time of the offense. Additionally, Lisa testified that she observed the defendant's face "very close" to the victim's bare buttocks while his pants were down and his hand was on his penis and that he said, "All I was doing was kissing her butt" when she confronted him. Viewed in the light most favorable to the State, this evidence was sufficient for a rational trier of fact to believe beyond a reasonable doubt that the defendant touched the minor victim's buttocks with his mouth for the purpose of sexual arousal or gratification and therefore committed the crime of aggravated sexual battery. See Tenn. Code Ann. § 39-13-504(a)(4) (2003). The defendant's argument is without merit.

### II. Whether the Jury was Tainted by Overhearing Certain Courtroom Conversation

The defendant also argues that "the trial court erred in denying the defendant's motion for a new trial when the defendant was convicted by a jury panel that had been tainted by conversations of the victim and her family in the courtroom overheard by the jury." Specifically, he contends that Lisa's testimony at the motion for a new trial hearing that she was seated ten feet away from prospective jurors, and the defendant's testimony that he saw her speaking to a juror, removes the veil of impartiality.

At the hearing on the motion for a new trial, Lisa acknowledged that she and her family were sitting ten feet from the pool of potential jurors during the voir dire process but denied that she spoke to any of them or that she knew any of them. Asked if she mentioned or spoke with her family or anyone else concerning the defendant's past criminal history, she said, "No. Not that day." The defendant testified that Lisa and her family "were sitting amongst some of the jurors during jury selection, and more than likely that they were discussing things." However, he said he did not actually hear any discussion that allegedly occurred because he "wasn't close enough to overhear the conversation." The trial court accredited Lisa's testimony from the hearing on the defendant's motion for a new trial and denied the motion, finding that the jury pool was not tainted.

"When a juror's apparent misrepresentation or concealment of information during voir dire examination is challenged during a hearing incident to the motion for a new trial, the accused, as the moving party, has the burden of showing he or she incurred actual bias or prejudice as a result of the failure to reveal the information." State v. Baker, 956 S.W.2d 8, 16 (Tenn. Crim. App. 1997) (citing State v. Bigbee, 885 S.W.2d 797, 805 (Tenn. 1994); State v. Caughron, 855 S.W.2d 526, 539 (Tenn. 1993)). The defendant's testimony at the hearing on the motion for a new trial that the victim and

her family "more than likely" were "discussing things" with potential jurors is sheer speculation. The record supports the determination of the trial court.

## **CONCLUSION**

Based on the foregoing authorities and reasoning, we affirm the judgment of the trial court but remand for entry of a corrected judgment to reflect the correct offense date.

_____
ALAN E. GLENN, JUDGE